# EXHIBIT A

# SETTLEMENT AND FRANCHISE TERMINATION AGREEMENT

This Settlement and Franchise Termination Agreement (the "Agreement"), is made as of this 23 day of October, 2018 by and between Coverall North America, Inc. d/b/a Coverall of Atlanta ("Coverall"), a Delaware corporation having its principal place of business in Deerfield Beach, Florida, and Janitorial Tech, LLC, a Georgia limited liability company ("Janitorial Tech"), and Randall R. Richardson, an individual member of Janitorial Tech ("Richardson") (Janitorial Tech and Richardson are collectively referred to in this Agreement as "Franchisee").   Coverall and Franchisee are collectively referred to herein as the "Parties."

## Recitals

A.   On May 17, 2016, Franchisee acquired a Coverall® Janitorial Franchised Business (the "Franchise").   (A copy of Franchisee's Janitorial Franchise Agreement (the "Franchise Agreement") is attached to this Agreement as Exhibit A.)

B.   The Franchise Agreement granted Franchisee the right, among other things, to use the Coverall® trademark and service marks owned by Coverall in connection with the operation of a commercial janitorial franchise business in Atlanta, Georgia.

C.   On or about June 27, 2017, Franchisee initiated an action in the United States District Court for the Northern District of Georgia entitled *Randall Richardson and Janitorial Tech, LLC, v. Coverall North America, Inc.*, Civil Action No. 1:17-cv-2405 (the "Lawsuit"), alleging claims against Coverall for, among other things, violations of the Fair Labor Standards Act.

D.   On or about December 7, 2017, Franchisee was ordered to mediate its claims against Coverall and, to the extent any claims remained unresolved after mediation, arbitrate any such claims.

E.   Franchisee and Coverall desire to settle all claims between the parties as of the date of this Agreement, including but not limited to the claims set forth in the Lawsuit, upon the terms and conditions set forth in this Agreement.

## Agreement

In consideration of the foregoing Recitals, the covenants, forbearance and undertakings of Coverall and Franchisee and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Coverall and Franchisee agree as follows:

1.   **Incorporation of Recitals**.   The Recitals set forth above shall be incorporated and construed as part of this Agreement as though they were fully set forth in this Agreement.

2.   **Court Approval**.   Within seven (7) days from the date the parties execute this Agreement, the Parties shall seek court approval of this settlement.   The parties agree that court approval of this settlement is a condition precedent to this Agreement's enforceability.   If the Parties do not obtain court approval of this settlement, this Agreement shall be of no further force or effect.

3.   **Settlement.**   Pursuant to the terms and conditions contained in this Agreement, the parties agree, as follows:

A. Within ten (10) days from the date the Parties obtain court approval of this settlement, Coverall shall:

    I.    Pay to Franchisee Twenty-Seven Thousand Three Hundred and Twenty-Five Dollars and No/100 ($27,325.00) (the "Settlement Amount"). The Settlement Amount shall be paid by cashier's or certified check made payable to Bloom Parham, LLP and delivered to Nick Phillips, Bloom Parham, LLP, 977 Ponce De Leon Ave., NE, Atlanta, Georgia 30306. Franchisee warrants and represents that the Settlement Amount constitutes the full and complete payment of any and all purported amounts owed and includes the purchase price for Franchisee's dollar amount of Business Owed and customers, as follows:

| Description | | |
|---|---|---|
| Purchase of Franchisee's Business Owed of $1,455.00 | | |
| Purchase of the following customers of Franchisee: | | |
| Customer No. | Name | RS |
| 135-3926 | Adult & Pediatric Medical Center | $239.00 |
| 135-3910 | Vallen | $289.00 |
| 135-3763 | Tsunami Volleyball | $325.00 |

    II.    Cancel all remaining balances due to Coverall on Franchisee's Promissory Notes, including the following:

| Promissory Note No. | Balance |
|---|---|
| 135-75692 | $9,875.59 |
| 135-75762 | $5,076.05 |
| 135-7805 | $597.43 |
| 135-76023 | $1,368.42 |
| 135-76025 | $459.15 |

B. Within five (5) days from the date Franchisee obtains court approval of this settlement, Franchisee shall dismiss the claims set forth in the Lawsuit, with prejudice, with no fees or costs awarded to either party and each party will bear their own costs and expenses related to the Lawsuit.

4.    **Termination of Franchise Agreement**. Upon execution of this Agreement, the Franchise Agreement (Exhibit A) shall be deemed terminated, and except as otherwise provided in this Agreement, all rights and obligations accorded Franchisee by the Franchise Agreement shall cease, and all rights and obligations imposed upon Coverall by the Franchise Agreement shall terminate.

5.    **Survival of Specific Provisions of the Franchise Agreement**. Franchisee acknowledges that the following provisions of the Franchise Agreement, and all other provisions of the Franchise Agreement which by their plain meaning survive termination, shall survive termination and that Franchisee shall remain obligated to abide by the terms and conditions of the following provisions, among other surviving provisions:

A. Paragraph 18.B ("Post-Term Restrictions");

B. Paragraph 23 ("Procedures After Expiration, Termination, or Assignment);

C.  Paragraph 20 ("Indemnification"); and

D.  Paragraph 25.A ("Dispute Resolution/Arbitration").

6.  **Cessation of Operations**.  Franchisee represents and warrants that Franchisee has ceased the use of the Coverall® trade name and service marks, and any other trade names, trademarks and service marks owned by Coverall, or which otherwise associate Franchisee with Coverall®.  Unless otherwise provided in this Agreement, Franchisee shall immediately and permanently cease to use, in any manner whatsoever, any:

A.  Confidential methods, procedures or techniques developed and owned by Coverall;

B.  Proprietary marks and distinctive names, symbols, logos, insignia, slogans, graphics and devices associated with Coverall®; and

C.  Assumed name or registration that contains the name Coverall®, canceling such registrations, and providing proof of cancellation to Coverall.

Franchisee further represents and warrants that Franchisee has ceased use of the Coverall System, including, but not limited to:  Operating, Training, Sales, and Technical Manuals and aids, videotapes, cassettes, books, advertising and promotional materials, and all trade secret and confidential and proprietary material delivered to Franchisee pursuant to the Franchise Agreement.

Subject to Paragraphs 18.B and 23 of the Franchise Agreement, and Paragraph 6 of this Agreement, nothing herein shall prohibit Randall Richardson from providing janitorial services under his own name or the name of an entity unaffiliated with Coverall.

7.  **Return of Proprietary Information**.  Franchisee represents and warrants that Franchisee has returned to Coverall all stationery, letterheads, forms, manuals, printed matter, films, books, cassettes, videotapes, and advertising containing Coverall's trademarks, including, but not limited to, the proprietary mark Coverall® or any similar names or marks or designation indicating or tending to indicate that Franchisee is or was an authorized Coverall franchisee and has returned to Coverall all leased equipment and any unused portion of the initial equipment and supply package, if any, provided to Franchisee.

Franchisee shall deliver any and all leased equipment and the unused portion of the initial equipment and supply packages, if any, to:

Coverall of Atlanta
3230 Peachtree Corners Circle, Suite A
Norcross, GA  30092
Attention:  General Manager

8.  **Warranty.**  Franchisee represents, covenants, and warrants that it shall neither encourage nor otherwise induce Coverall's franchisees to pursue claims against Coverall.

9.  **Release of Coverall.**  Effective upon the Parties obtaining court approval of this settlement, Janitorial Tech and Richardson, on behalf of themselves and each of their respective current and former agents, principals, officers, directors, shareholders, employees, representatives,

attorneys, accountants, insurers, spouses, parents, affiliates, subsidiaries, divisions, and successors and assigns, hereby release Coverall and its current and former agents, principals, officers, directors, shareholders, employees, representatives, attorneys, accountants, insurers, parents, affiliates, subsidiaries, divisions, and successors and assigns, of and from any and all manner of obligation, debt, liability, tort, covenant, contract, agreement, undertaking, and account, and any and all claims or causes of action that Janitorial Tech or Richardson had, have, or may have through the date of this Agreement, known or unknown, jointly or severally, including, without limitation, any claims asserted in the Lawsuit (including, without limitation, the wage and hour claims) and any and all facts or allegations which could give rise to a claim or cause of action, excepting only Coverall's obligations under this Agreement. Janitorial Tech and Richardson warrant and represent that they have not assigned or otherwise transferred any claim or cause of action released by this Paragraph 9.

10.     **Release of Franchisee**.   Effective upon the Parties obtaining court approval of this settlement, Coverall, on behalf of itself and its current and former agents, principals, officers, directors, shareholders, employees, representatives, attorneys, accountants, insurers, parents, affiliates, subsidiaries, divisions, and successors and assigns, hereby releases Janitorial Tech and Richardson and their respective current and former agents, principals, officers, directors, shareholders, employees, representatives, attorneys, accountants, insurers, spouses, parents, affiliates, subsidiaries, divisions, and successors and assigns, of and from any and all manner of obligation, debt, liability, tort, covenant, contract, agreement, undertaking, and account, and any and all claims or causes of action Coverall had, has, or may have through the date of this Agreement, known or unknown, including, without limitation, and any and all facts or allegations which could give rise to a claim or cause of action, excepting only Janitorial Tech's and Richardson's obligations under this Agreement. Coverall warrants and represents that it has not assigned or otherwise transferred any claim or cause of action released by this Paragraph 10.

11.     **Entire Agreement**.   This Agreement, any Exhibit attached to it and the documents referred to in it, shall be construed together and constitute the entire, full and complete agreement between Coverall and Franchisee concerning the subject matter of this Agreement, and shall supersede all prior agreements. No other representation has induced Franchisee to execute this Agreement, and there are no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied in this Agreement, which are of any force or effect with reference to this Agreement or otherwise. No amendment, change or variance from this Agreement shall be binding on either party unless executed in writing by both parties.

12.     **Governing Law and Jurisdiction**.   This Agreement shall be interpreted in accordance with the law of the State of Georgia.

13.     **Attorneys' Fees.**   The parties shall bear their respective attorneys' fees, costs, and expenses incurred in connection with the negotiation and execution of this Agreement; provided, however, should any legal action be instituted to enforce the terms of this Agreement, the prevailing party shall be entitled to recover all litigation costs, including but not limited to attorneys' fees.

14.     **Severability and Construction**.

    A.     Each paragraph, part, term and/or provision of this Agreement shall be considered severable, and if, for any reason, any paragraph, part, term and/or provision herein is

determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation such shall not impair the operation of or affect the remaining portions, sections, parts, terms and/or provisions of this Agreement, and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid sections, parts, terms and/or provisions shall be deemed no part of this Agreement.

B.   All captions in this Agreement are intended solely for the convenience of the parties, and none shall be deemed to affect the meaning or construction of any provision of this Agreement.

C.   This Agreement may be executed in duplicate, and each copy so executed shall be deemed an original.

D.   Each party hereto has cooperated in the drafting and preparation of this Agreement. Hence, in any construction to be made of this Agreement, the same shall not be construed against any party.

E.   This Agreement is and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that nothing contained herein shall create or be construed as creating any third-party beneficiary rights.

F.   At any time on or after the date of this Agreement, the parties shall perform such acts, execute and deliver such instruments, assignments, endorsements and other documents, and do all such other things consistent with the terms of this Agreement as may be reasonably contemplated by this Agreement or otherwise necessary to carry out its purposes.

15.   **Arbitration.**  Except as otherwise provided in this Agreement or the Franchise Agreement, all controversies, disputes or claims between Coverall, its officers, directors, agents and/or employees (in their respective capacities) and Franchisee (and Franchisee's owners, officers, directors, agents and/or employees and/or any guarantors of the Franchise Agreement) arising out of or related to this Agreement or the Franchise Agreement or the validity of this Agreement or the Franchise Agreement or any provision thereof (including this arbitration agreement, the validity and scope of which Coverall and Franchisee acknowledge and agree is to be determined by an arbitrator, not a court), any related agreement between the parties or the validity thereof, the relationship of the parties hereunder or under any related agreement between the parties, and/or any specification, standard or operating procedure of Coverall, including those set forth in the Franchise Owner's Policies and Procedures Manual referenced in the Franchise Agreement, shall be submitted promptly for binding arbitration in accordance with the provisions of the Franchise Agreement relating to Dispute Resolution.

16.   **Notices**.

A.   Any and all notices, requests, consents and other communications required, permitted or necessitated by this Agreement shall be in writing personally delivered (by overnight courier or other messenger service) or mailed by certified mail, return receipt requested, to the respective parties at the following address unless and until a different address has been designated by written notice to the other party:

| | |
|---|---|
| Notices to Coverall: | Chief Legal Officer<br>Coverall North America, Inc.<br>350 SW 12th Avenue<br>Deerfield Beach, FL 33442<br>Fax: (561) 922-2409 |
| Notices to Franchisee: | Attn: Randall R. Richardson<br>Janitorial Tech, LLC<br>891 Catherine Street<br>Forest Park, GA 30297 |

B.  Any notice by certified mail shall be deemed to have been given at the date and time of mailing.

17.  **Non-Waiver**.  The failure of any party to enforce any part of this Agreement or of the provisions of the Franchise Agreement which survive termination shall not constitute a waiver by such party of their rights to do so in the future, nor shall it be deemed as an act of ratification and consent.

18.  **Representation by Counsel.**  The parties warrant and represent to each other that they have had the benefit of legal representation of their choice in connection with this Agreement, that they and their attorneys have reviewed this Agreement prior to its execution, and that they have read, understand and intend to be bound by this Agreement and all terms and conditions herein contained.

19.  **Authority to Bind**.  Each person executing this Agreement on behalf of a party hereto, for him/herself and on behalf of the party for which he/she is executing, represents and warrants that he/she has received all necessary power and authority to do so and to bind the entity on whose behalf he/she signs this Agreement and, further, that all necessary consents and/or approvals for such entity to enter into this Agreement have been obtained or waived.

Executed as of the date first written above:

COVERALL NORTH AMERICA, INC.

By: _____
Its Authorized Representative

JANITORIAL TECH, LLC

By: _____
Its Authorized Representative

RANDALL R. RICHARDSON

By: _____
Individually

# EXHIBIT A

EAST\30453214.1

FRANCHISE # _423_                                                    NEW FRANCHISEE

COVERALL NORTH AM~~~~~~ MAY 2 0 2016 ~~~~LL OF ATLANTA

3230 Peachtree C~~~~~~~~~~~~~~~~~~~~~~~~GA 30092

JA~~~~~~~~~~~~~~~~~~~~~~~EEMENT

THIS AGREEMENT is entered into between Coverall North America, Inc., dba Coverall of **ATLANTA** a corporation organized and existing under the laws of the State of Delaware ("Coverall") and _Janitorial Tech LLC_ ("Franchisee") for the purposes of granting Franchisee the rights necessary to operate a Coverall Franchised Business. Franchisee is doing business as a:

☐ Corporation, state of incorporation: _____   ☑ LLC, state of organization: _GA_

Effective Date of Agreement: _5-17-16_

Term of Franchise ("Initial Term"): 20 years

Package Purchased: **P-** _3000_

Initial Business Offering Period: _120_ business days

Non-Refundable Franchise Fee: $ 15,570.00

Down Payment: $ 3,500.00

Amount Financed: $ 12,070.00
(with interest at 12% per annum)

Financing Period: _36_ months

Amount of Each Monthly Installment: $ 400.97

The first installment of principal and interest shall be paid on _August 1, 2016_ , 20___.

**Franchisee agrees to receipt of all correspondence sent via U.S. MAIL at the following address:**
891 Catherine St.

**Email Address:** _janitorialtech@gmail.com_          **FEIN:** 45 - 4686H 4684611

Owner Name: Randall Richardson

Address: _891 Catherine St._

Phone: _(702) 902-7256_          Percentage Interest*: _100_

Owner Name: _____

Address: _____

Phone: _____          Percentage Interest*: _____

Owner Name: _____

Address: _____

Phone: _____          Percentage Interest*: _____

Owner Name: _____

Address: _____

Phone: _____          Percentage Interest*: _____

©2016 Coverall North America, Inc.

Initial  Initial

## TERMS OF AGREEMENT

NOW, THEREFORE, for and in consideration of the mutual rights and obligations contained in this Agreement, Coverall and Franchisee agree as follows:

1. NATURE AND SCOPE OF FRANCHISE.

A. Coverall sells and supports franchised commercial janitorial cleaning businesses (the "Franchised Business"). Franchisee is purchasing a Franchised Business and receives the right to use the Coverall System, a system for the ongoing development and operation of a commercial janitorial cleaning business, and the right to use certain Coverall trade names, service marks and trademarks, including the trade names "Coverall®," "Coverall Health-Based Cleaning System®," and/or such other names, designs, and logos as Coverall may from time to time designate (the "Marks"). The Coverall® System is operated widely within the United States of America and in certain foreign countries.

B. Coverall owns the Coverall System and Marks, and has the right to authorize their adoption and use.

C. The rights granted to Franchisee to operate the Franchised Business are set forth in this Agreement.

D. The Franchised Business shall be operated in conformity with the Coverall System and adherence to Coverall's standards, policies and procedures as they may be issued from time to time.

E. Franchisee intends by executing this Agreement to purchase a Franchised Business becoming an independent business owner of a Coverall® Franchised Business.

2. FRANCHISE GRANT AND TERM.

A. Coverall grants Franchisee for the stated Term, the right, license, and privilege to adopt and use the Coverall System, to advertise to the public that Franchisee is a franchisee of Coverall, and to adopt and use, but only in connection with the sale of commercial cleaning services and the provision of commercial cleaning services, the Marks that Coverall shall designate from time to time.

B. The Term of this Agreement is twenty (20) years.

C. Upon the expiration of the Term of this Agreement, Franchisee shall have no further right to operate a Franchised Business unless Coverall and Franchisee execute a written renewal agreement ("Renewal Agreement"). The Renewal Agreement shall be upon the terms and conditions as Coverall is then granting to new franchises, which terms and conditions may be materially different from the terms and conditions of this Agreement. There is no charge to renew the Franchise. As a condition of renewal, Franchisee shall execute a general release in favor of Coverall.

D. The Term shall begin on the Effective Date.

3. TERRITORY.

Franchisee is not granted an exclusive territory. Franchisee may conduct the Franchised Business only in the area covered by the Coverall Support Center where Franchisee bought the Franchised Business ("the Area"). Coverall will sell numerous janitorial franchises in the Area.

4. FRANCHISE FEE.

The Franchise Fee stated on Page 1 is non-refundable. A portion of the Initial Franchise Fee, $5,000, is the price that you pay for the license granted to you to use the Coverall® Marks and System.

5. ROYALTY AND SUPPORT FEE.

Franchisee is obligated to pay Coverall a Royalty and Support Fee on Franchisee's monthly Gross Dollar Volume. Gross Dollar Volume includes all service fees billed to a customer. The Royalty is for the right to use the Coverall System and the Marks; and the Support Fee is for the support that Coverall provides to Franchisee.

A. Royalty. Franchisee shall pay Coverall a Royalty in an amount equal to five percent (5%) of Franchisee's monthly Gross Dollar Volume billed, and the Royalty shall be payable monthly on the last calendar day of the month following the month in which Franchisee serviced the customers.

B. <u>Support Fee</u>.  Franchisee shall pay Coverall a Support Fee equal to ten percent (10%) of Franchisee's monthly Gross Dollar Volume billed, and the Support Fee shall be payable monthly on the last calendar day of the month following the month in which Franchisee serviced the customers.

6. <u>OTHER FEES.</u>

A. <u>Special Services Finder's Fee</u>.  Special service contracts are one-time, non-recurring contracts for services such as carpet cleaning, strip and waxing, window washing, or initial cleaning.  A fee shall be charged for special service contracts obtained by Coverall and accepted by Franchisee.  However, there shall be no fee charged for special service contracts obtained solely by Franchisee.

B. <u>Transfer Fee</u>.
   (i) The Transfer Fee charged pursuant to Coverall's consent to the assignment in whole or in part of the Franchised Business and/or this Agreement to a third party is the fee as published and revised from time to time, in the Franchised Business Policies and Procedures Manual (the "Policies and Procedures Manual").
   (ii) The Customer Transfer Administrative Fee charged for transfer of a customer to another Franchisee is ten percent (10%) of the Regular Service Volume attributable to each transferred customer, not to exceed Five Hundred Dollars ($500) per customer transferred.
   (iii) The Business Owed Transfer Administrative Fee charged for the transfer of Business Owed to another franchisee is ten percent (10%) of the Business Owed transferred.  (Business Owed is defined in Paragraph 13.)

C. <u>Bid and Negotiation Fee</u>.  If Franchisee requests assistance from Coverall with bidding (for example, establishing the contract price) for a potential customer, there will be a one-time fee as published and revised from time to time in the Policies and Procedures Manual.

7. <u>PAYMENT OF FEES AND OTHER OBLIGATIONS.</u>

Coverall supports Franchisee by billing and collecting Franchisee's Gross Dollar Volume, its customer receivables. (See Paragraph 16B.)  Franchisee hereby authorizes Coverall to deduct from Franchisee's Gross Dollar Volume, or any other amounts collected on Franchisee's behalf, the financed portion of the Franchise Fee (principal and interest), Royalties, Support Fees, the financed portion of any Sales and Marketing Fees for the purchase of Additional Business (principal and interest), Special Services Finder's Fees, any Retentions for National Account Customers, the financed portion of equipment purchases (principal and interest), fees charged to participate in any Coverall insurance programs, any other obligations due and owing to Coverall by Franchisee, and any other fees or charges that Franchisee may authorize Coverall to deduct ("Authorized Deductions").

8. <u>BUSINESS MULTIPLIERS.</u>

The Business Multipliers are factors that determine the amount that either Franchisee must pay Coverall for Additional Business, or that Coverall may pay to Franchisee to purchase Franchisee's customers or Business Owed.  The Business Multipliers are the factors published and revised from time to time in the Policies and Procedures Manual.  The Business Multiplier applied to purchases of Additional Business by Franchisee may be higher if Franchisee has previously lost customers for cause.

9. <u>TRAINING.</u>

Franchisee acknowledges the importance of quality and uniformity of business operation among all Franchised Businesses in the Coverall System; and Franchisee agrees to enroll Franchisee or, with Coverall's consent, Franchisee's designated employee(s) in the Initial Training program.

A. Initial Training is a forty (40) plus hour program that consists of classroom and on-site instruction on, among other things, cleaning techniques, customer service, and business management.
B. Initial Training may take up to eight (8) weeks to complete, or longer depending upon Franchisee's schedule.

C.  Coverall's obligation to offer Franchisee sufficient customers to fill Franchisee's Franchise Package does not begin until:
  (i)  Franchisee or Franchisee's designated employee, as approved by Coverall, has satisfactorily completed the Initial Training;
  (ii) Franchisee has complied with the provisions of Paragraph 10 of this Agreement; and
  (iii) Franchisee's background screening has been approved.

10.  INCORPORATION, BUSINESS LICENSE AND BUSINESS BANK ACCOUNT.

Franchisee must be a corporation or limited liability company, and Franchisee must keep separate accounting, banking, and financial records for the operation of its Coverall Franchised Business.  Prior to signing this Agreement, Franchisee shall procure a business license, if applicable; obtain a Federal Employer Identification Number ("FEIN"); and open a business bank account in the name of the Franchised Business.

11.  MANUALS.

Coverall shall loan Franchisee the Coverall Operations Manual and Policies and Procedures Manual (the "Manuals"); and grant access to Coverall's on-line training program.  The Manuals contain detailed proprietary information about the Coverall System.  Franchisee agrees to promptly adopt and use exclusively the methods, policies and procedures contained in the Manuals; the Manuals are revised from time to time.  Franchisee acknowledges that Coverall owns all proprietary rights in and to the Coverall System, and that the information revealed in the Manuals, in their entirety, constitutes confidential trade secrets.  Without the prior written consent of Coverall, Franchisee shall not disclose the content of the Manuals to any person, except employees of Franchisee for purposes related solely to the operation of the Franchised Business, nor shall Franchisee reprint or reproduce the manuals in whole or in part for any purpose except in connection with the instruction of Franchisee's employees in the operation of the Franchised Business.  Upon termination of the Franchise for any reason, Franchisee shall return the Manuals to Coverall.

12.  COMPLIANCE WITH COVERALL SYSTEM.

Franchisee agrees that every component of the Coverall System is important to Coverall and the operation of the Franchised Business, including, but not limited to, uniformity of services, appearance, and adherence to Coverall standards and policies.  Coverall shall have the right to observe and evaluate from time to time Franchisee's business operations, including but not limited to, on-site visits and surveying any customer premises serviced by Franchisee to assure that the quality of the services rendered is in accordance with Coverall standards and policies.

13.  THE FRANCHISE PACKAGE.

Franchisee purchased the Franchise Package described on Page 1.  Coverall is obligated to fulfill that Franchise Package by offering Franchisee commercial cleaning customers within the Initial Business Offering Period described on Page 1.  Coverall procures commercial cleaning customers and offers those customers to Franchisee to fulfill the Franchise Package and get Franchisee started in the Franchised Business.  Franchisee may accept or reject an offered customer.

Coverall does not have an inventory of customers and that is why Coverall has a specified number of business days from the date on which Franchisee completes mandatory training to offer customers to fill the Franchise Package.  The Regular Service Volume that Coverall is obligated to offer Franchisee is commonly referred to as "Business Owed."  Business Owed refers to Initial Business, to Additional Business purchased by Franchisee, and to Replacement Business owed pursuant to certain guarantees.

A.  The Franchisee Fee includes Initial Business.  The amount of Initial Business is equal to the Franchise Package purchased.  Initial Business is a specific dollar amount of Regular Service Volume.

B. The Franchise Package purchased is not a guarantee that Franchisee will earn an equivalent amount of Gross Dollar Volume each month; and except for customers lost during the guarantee period, neither does it mean that Coverall is obligated at any time to replace lost customers to enable Franchisee to maintain that level of Gross Dollar Volume.

C. Coverall is obligated to offer Franchisee, within the Initial Business Offering Period, one or more commercial cleaning customers to fulfill the Initial Business. The customers offered to Franchisee may be new customers recently acquired by Coverall; or existing customers that become available for resale. Coverall's obligation to offer customers to Franchisee does not arise until Franchisee has satisfied the obligations of Paragraph 9.

D. If Franchisee accepts a customer offered to fulfill Initial Business that has Regular Service Volume in excess of that required to fulfill Initial Business, the excess Regular Service Volume is Additional Business and Franchisee must pay Coverall for the excess as provided in Paragraph 15. As a condition of acceptance and purchase of Additional Business, you will be required to sign a general release in favor of Coverall.

E. The Service Agreements for customers accepted by Franchisee will be assigned to Franchisee subject to the terms and conditions of this Agreement and the Assignment, and will become assets of the Franchised Business. The Assignment shall be conditional subject to, among other things, payment in full of the financed portion of the Franchise Fee or purchases of Additional Business. Assignment of the Service Agreements shall not prohibit Coverall from selling Special Services, equipment, chemicals or supplies to Franchisee's customers. Franchisee may accept and service National Account Customer locations, locations of local multiple location customers, or customers with contracts that prohibit assignment; but these customers will not be assigned to Franchisee and Franchisee's only interest in such customers will be the right to receive the amounts specified in Paragraph 16B(ii).

F. If Franchisee refuses to accept any customer offered by Coverall to fulfill Initial Business, the time for offering the Initial Business is extended; and Coverall shall remain obligated to offer, within a reasonable period of time after the expiration of the Initial Business Offering Period, the amount of Initial Business reasonably refused by Franchisee.

G. The Initial Business Offering Period may be suspended if:
   (i)   Coverall requires Franchisee to attend retraining; or
   (ii)  Franchisee is in breach of any material provision of this Agreement or any other agreement between Coverall and Franchisee.

H. If the Initial Business Offering Period expires and Coverall has not offered Franchisee sufficient customers with adequate Regular Service Volume to satisfy the total amount of Initial Business, Franchisee may request Coverall to:
   (i)   Pay Franchisee for the amount of the Franchise Package not timely offered times the Business Multiplier applicable to the purchase of Additional Business under this Paragraph 13H as published and revised from time to time in the Policies and Procedures Manual; and
   (ii)  Coverall shall first apply refunds due pursuant to 13H (i) to any obligations owed by Franchisee to Coverall, and pay the balance, if any, to Franchisee.

This is the sole remedy available to Franchisee for Coverall's failure to timely offer Initial Business.

14. THE COVERALL INITIAL BUSINESS GUARANTEE.

Coverall provides a limited guarantee of the Initial Business accepted by Franchisee. The purpose of the guarantee is to help Franchisee through the start-up phase of the Franchised Business. The guarantee applies only to customers lost through no fault of Franchisee; and entitles Franchisee to a one (1) time replacement of each customer's monthly Gross Dollar Volume accepted by Franchisee to fulfill Initial Business. The guarantee does not apply to Initial Business customers voluntarily abandoned by Franchisee.

A. Initial Business is guaranteed for a one time only replacement for twelve (12) months from the date Franchisee first services the customer, but only if the customer is lost through no fault of Franchisee. The guarantee entitles Franchisee to a one-time replacement of Initial Business Regular Service Volume (customer) lost through no fault of Franchisee. Coverall will within a reasonable period of time offer Franchisee one or more customers generating Regular Service Volume at least equal to that lost by Franchisee to fulfill the guarantee.

©2016 Coverall North America, Inc.

Initial   Initial

B.  The guarantee period begins to run on the date Franchisee begins servicing the Initial Business customer.

C.  If the customer(s) offered to replace the guaranteed lost Initial Business generates Regular Service Volume in excess of that lost and Franchisee accepts the customer, Franchisee will have to pay Coverall for the excess Regular Service Volume. The payment to Coverall shall be equivalent to the Business Multiplier times the excess Regular Service Volume.

15.  GROWING THE FRANCHISED BUSINESS.

After Franchisee's Franchise Package is filled, Coverall is not obligated to offer Franchisee additional Regular Service Volume ("Additional Business"). Franchisee may grow the Franchised Business by i) personally obtaining customers for the Franchised Business, ii) purchasing Additional Business from Coverall in the event Coverall has Additional Business available to offer Franchisee, or iii) purchasing Additional Business from other Coverall franchise owners. As a condition of acceptance and purchase of Additional Business from Coverall, you will be required to sign a general release in favor of Coverall. Additional Business, including National Account Customers, may be new customers recently acquired by Coverall, or they may be existing customers that become available for resale.

A.  The fee charged for Additional Business is the Business Multiplier times the Regular Service Volume Franchisee desires to purchase (the "Sales and Marketing Fee"). Franchisee will pay a higher multiple if Franchisee has previously lost a customer for cause. Once Franchisee has paid in full for the Additional Business, Coverall will have a reasonable period of time from the date of payment in full within which to offer the Additional Business. If Coverall does not offer the Additional Business within a reasonable period of time, Franchisee will be entitled to a refund of the Sales and Marketing Fee paid to Coverall.

B.  From time to time, Coverall may initiate an offer of Additional Business to Franchisee. If Franchisee accepts the offer, Franchisee shall pay the Sales and Marketing Fee stated in Paragraph 15A. Coverall may finance up to fifty percent (50%) of the Sales and Marketing Fee.

C.  Additional Business purchased from Coverall is guaranteed for a one time only replacement for six (6) months from the date Franchisee first services the customer, but only if the customer is lost through no fault of Franchisee. Coverall will replace the monthly Gross Dollar Volume of the Additional Business within a reasonable period of time. If Coverall does not offer the replacement Additional Business within a reasonable period of time, Franchisee's sole remedy is a refund of the Sales and Marketing Fee paid to Coverall. Coverall shall first apply any refund due under this Paragraph 15C to any obligations owed by Franchisee to Coverall, and pay the balance, if any, to Franchisee. The Additional Business guarantee does not apply to customers obtained by Franchisee or to promotional Regular Service Volume provided to Franchisee by Coverall free of charge.

16.  BUSINESS AND SUPPORT SERVICES PROVIDED BY COVERALL.

Coverall provides business and support services to Franchisee for the Support Fee paid to Coverall. Coverall will provide the following services:

A.  Additional Training.  Franchisee is required to complete Initial Training in the Coverall System. Subsequent training is Additional Training, and may include, but shall not be limited to, any training course offered in the Initial Training, or any other training provided by Coverall to Franchisee and/or Franchisee's employee(s). Additional Training may also include courses introducing new methods and any certification requirements developed after the Initial Training, which Additional Training may be mandatory in Coverall's sole discretion. Franchisee's Additional Training may be offered online, through webinars, personal consultation and/or through group seminars. Personal consultations may be scheduled at the request of Franchisee and may be conducted by telephone or in person. There is no charge for Additional Training.

B.  Billing and Collection.  Coverall provides billing and collection services for Franchisee, including billing customers for services and supplies provided by Franchisee, collecting the amounts due from those customers, and remitting to Franchisee the amounts collected from those customers on Franchisee's behalf, less Authorized Deductions. Coverall has the exclusive right to bill and collect in your business name from your customers during the Term of this Agreement.

(i)     At the beginning of each month, Coverall shall invoice and collect payment from Franchisee's customers according to the customer contract (the "Service Agreement"), and for any other services and supplies that may have been provided by Franchisee.  On the last calendar day of the month following the month in which the services and supplies were provided by Franchisee (if the last calendar day of the month falls on a weekend and/or holiday, payment will be made on the next business day), Coverall will distribute to Franchisee amounts collected from Franchisee's customers less the Authorized Deductions.  If applicable, Coverall will remit any state sales tax collected from Franchisee's customers to the appropriate state taxing authority.

(ii)    With the exception of National Account Customers that Franchisee's Franchised Business may service, Franchisee is entitled to receive the total amount collected from each customer, less all Authorized Deductions.  National Account Customers are customers that have multiple national or regional locations.  Coverall may retain a percentage, or another specified portion, of the total amount collected from the National Account Customer (the "Retention").  Therefore, the amount that Franchisee will receive for servicing a National Account Customer location may not be equivalent to a pro rata share of the total monthly amount that is collected from the National Account Customer, or equivalent to the amount that is collected from the National Account Customer for the location serviced by Franchisee.  To the extent that there is excess Retention, those funds are kept by Coverall. The Retention, however, does not affect the amount of Regular Service Volume offered to you to fulfill either your Initial Package or sold to you as Additional Business.

(iii)   If a customer discontinues Franchisee's services for any reason and the customer is Franchisee's only customer, Coverall shall have the right to apply the entire amount of any payment subsequently collected by Coverall from that customer to any amount owed by Franchisee to Coverall.  Nothing contained in this Paragraph 16B(iii), however, shall be construed to release Franchisee from its obligations to Coverall for any amount remaining due after applying the funds received from the discontinued customer.

(iv)    If a customer that Coverall bills on Franchisee's behalf is delinquent in payment, Coverall may, after consulting with Franchisee, stop invoicing that customer.  If Franchisee chooses to continue servicing a delinquent customer, Franchisee does so at the risk of non-payment.

(v)     If Coverall must file a lawsuit against a delinquent customer and Coverall collects from that customer, Franchisee will be entitled to receive the amount collected net of Coverall's Royalty and Support Fee and the costs of collection, including attorney's fees, costs, and expenses.

(vi)    Coverall may, after consulting with Franchisee, settle and compromise delinquent customer obligations, which means that Coverall may agree to accept less than the amount owed by the customer.  Franchisee will be entitled to receive the amount collected net of Coverall's Royalty and Support Fee and the costs of recovery, including attorney's fees, costs and expenses.

(vii)   The balance of the funds collected from Franchisee's delinquent customers pursuant to Paragraphs 16B(v) and (vi) will first be applied to any amount owed by Franchisee to Coverall, and the balance, if any will be paid to Franchisee.

(viii)  Franchisee agrees to cooperate with Coverall in the collection of delinquent customer receivables, including but not limited to reassignment of the Service Agreement to Coverall.

(ix)    If Franchisee chooses at its own expense to file a lawsuit to collect from a delinquent customer, Franchisee must pay Coverall its Royalty and Support Fee on any amount collected.

C.  Cash Flow Protection Services.  Coverall will advance [loan] to Franchisee the amounts billed to Franchisee's customers, whether or not those amounts have been collected.  Advances will be made no earlier than the last calendar day of the first month following the month the services and supplies were provided (if the last calendar day of the month falls on a weekend and/or holiday, payment will be made on the next business day).  Advances attributable to billings for any one customer shall not exceed an amount equal to billings for sixty (60) days and shall not remain outstanding for a period exceeding ninety (90) days from invoice date. If advances remain uncollected from the customer at the end of ninety (90) days, Franchisee shall repay Coverall the total amount billed to the customer that is advanced to Franchisee.  Coverall may recover the advance through Franchise Statement Deductions.  However, if Franchisee has insufficient Gross Dollar Volume to cover the advances, then Franchisee must pay Coverall directly.

17. FRANCHISED BUSINESS OPERATIONS.

Franchisee acknowledges that every component of the Coverall System is important to Coverall, its Franchisees, and to the operation of the Franchised Business. Franchisee shall comply with the entire Coverall System, including but not limited to the following:

A. Franchisee to Attend Training Course. Franchisee shall attend and successfully complete Initial Training, and any other Additional Training that Coverall may require from time to time. Coverall may, in its sole discretion, agree in writing to allow a designee of Franchisee to attend initial Training instead of Franchisee. Franchisee's employees may also attend training.

B. Retraining of Franchisee. If any of the following events occur, Franchisee may be required to attend retraining:

  (i)   Within a sixty (60) day period, any two (2) customers being serviced by Franchisee, complains about Franchisee's faulty workmanship, lack of trustworthiness, or any other claimed default by Franchisee; or

  (ii)  At any time any customer being serviced by Franchisee cancels Franchisee's services for faulty workmanship, lack of trustworthiness, or other default under that customer's Service Agreement.

In the event of retraining, the time within which Coverall must offer any remaining Initial Business or Additional Business will be suspended from the time Franchisee is requested to attend retraining until Franchisee completes retraining to Coverall's satisfaction.

C. Staffing. Franchisee shall be responsible for all employment decisions and functions of the Franchised Business, including without limitation, hiring, firing, training, wage and hour compliance, compliance with federal immigration laws, record keeping, and supervision.

D. Franchisee to Use Coverall Approved Equipment, Chemicals and Cleaning Supplies. Franchisee shall use only Coverall specified equipment, chemicals and cleaning supplies in Franchisee's Franchised Business. Specifications may change from time to time, and Franchisee shall at Franchisee's sole expense comply with any such changes. Coverall will provide Franchisee with specifications at Initial Training and the procedures to obtain approval on non-approved equipment, chemicals, and supplies will be published and revised from time to time in the Policies and Procedures Manual.

E. Identifying Franchisee's Franchised Business Franchisee shall identify its Franchised Business as an independently owned and operated franchise of Coverall (in the manner Coverall specifies) and cause all persons involved in the operation of the Franchised Business to reflect that independent status with customers and other third parties. Franchisee shall cause all persons involved in the operation of the Franchised Business to wear approved apparel. Franchisee shall comply with customer-imposed requirements, which may include the use of identification badges.

F. Insurance. Franchisee shall acquire and maintain in effect the following insurance coverage in the following minimum amounts, or in the amounts that Coverall may require according to the Policies and Procedures Manual, as published and revised from time to time:

  (i)   Janitorial bonding in an amount not less than $100,000;

  (ii)  Comprehensive liability insurance covering property damage, loss and personal injury in amounts not less than $1,000,000 per occurrence; $2,000,000 in the aggregate; and a $5,000,000 umbrella policy, which policy shall not contain an exclusion for property in Franchisee's care, custody and control;

  (iii) Comprehensive automobile liability insurance, including personal injury and property damage insurance, in the minimum amount of $50,000, or the amount required by state law, whichever is higher;

  (iv)  Workers' compensation insurance for Franchisee and its employees for statutory limits (regardless of the requirements of state law, if Franchisee has employees, utilizes subcontractors or is assisted by family members, Franchisee shall purchase workers' compensation insurance);

  (v)   If Franchisee does not have workers' compensation covering the owner of the Franchised business, then Franchisee must obtain on-the-job accident and disability coverage for the owners of the Franchise having the following minimum coverage: accidental death ($20,000.00), accidental dismemberment ($20,000.00), paralysis ($20,000.00), temporary total disability

($500.00 per week for 52 weeks), continuous disability ($500.00 per week for 52 weeks), and accident medical expense (maximum benefit of $50,000.00 for 52 weeks);

(vi) Employer's liability insurance in amounts no less than $100,000.00 each accident for Franchisee and all of its employees; and

(vii) Franchisee shall comply with all state and federal laws to maintain a proper unemployment insurance account.

All insurance policies shall name Coverall as an additional insured. Franchisee shall provide Coverall with proof of the above insurance coverage prior to Franchisee starting his Franchised Business and no later than ten (10) days after Franchisee completes Initial Training. If Franchisee fails to obtain any or all insurance as specified herein and approved by Coverall, Coverall may (but shall not be required to), in addition to other remedies, purchase such insurance for the benefit of Franchisee in which event Franchisee agrees to promptly reimburse Coverall for the cost. In the event it becomes necessary for Franchisee to reimburse Coverall for the costs of insurance, Franchisee hereby authorizes Coverall to deduct the costs of the insurance, on a monthly basis, or as is otherwise necessary, from Franchisee's Gross Dollar Volume.

Franchisee may choose to participate in Coverall's Business Protection Plan and other insurance programs that offer some of the insurance coverage required by this Paragraph. The cost of participating in Coverall's Business Protection Plan or other insurance programs is typically more expensive than similar insurance coverage available from other sources. Coverall earns a profit on its Business Protection Plan and other insurance programs.

G. <u>Franchisee to Abide by Policies and Procedures.</u> Franchisee shall be free to conduct its business as it deems best in providing services to its customers. However, Franchisee understands and acknowledges that implementation of the Coverall System is essential to the Coverall® brand in order to:

(i) Develop and maintain quality operating standards;

(ii) Increase the demand for the services sold by other franchisees and by Coverall on behalf of all franchisees operating Coverall Franchised Businesses; and

(iii) Protect Coverall's brand, reputation and goodwill.

Franchisee may not implement any modification to the System without Coverall's prior written consent. Coverall shall have the right to incorporate any modification to the System developed by Franchisee without compensation to Franchisee.

H. <u>Franchisee to Abide by all laws.</u> Franchisee agrees to abide by all of the terms of this Agreement, the Policies and Procedures Manual and all federal, state and local laws, including but not limited to:

(i) Franchisee shall obtain all applicable business licenses and/or registrations from all local or state agencies having jurisdiction over Franchisee's Franchised Business, as required. Franchisee shall furnish Coverall proof that Franchisee obtained the applicable business licenses and registrations.

(ii) Franchisee shall be solely responsible to pay any taxes or other assessments due to any governmental agencies.

(iii) Franchisee is solely responsible for the payment of the employer's portion of social security and other taxes required to be withheld for Franchisee's employees.

(iv) Franchisee shall also pay all taxes withheld from employee wages, and premiums for unemployment and worker's compensation insurance, as required by law.

(v) Franchisee shall provide Coverall, upon demand, proof of payment of all taxes due and compliance with all laws.

I. <u>Modification to the System.</u> Franchisee acknowledges and agrees that due to changes in competitive circumstances, presently unforeseen changes in the needs of the market place, changing customer demands, presently unforeseen technological innovations, and for protection of the Marks, the Coverall System must be subject to modification in order to best serve the interests of Coverall, Franchisee, and the Coverall System. Accordingly, Franchisee expressly acknowledges and agrees that Coverall may from time to time alter, modify, or change the components of the Coverall System, including, but not limited to, modifying, altering, varying, and adopting new products, services, equipment, techniques, methods, programs, standards, training, sales training, forms, and policies and procedures; adding to, deleting from, or modifying those programs and services which Franchisee is authorized to offer; and changing, improving, or modifying the Marks. Franchisee agrees, at Franchisee's own expense, to adopt on a timely basis (but

in no case later than sixty (60) days after notice) any such modifications to the Coverall System set forth in updates or changes to the Policies and Procedures Manual, or in other written communications, as if they were a part of the Coverall System at the time of the execution of this Agreement. Coverall shall notify Franchisee in writing as to changes in the Policies and Procedures Manual or other changes in the operational structure of the Franchise.

J.  Coverall's Right to Audit.  Franchisee agrees to keep true and accurate business records and books of account which shall be open to examination by Coverall or its duly authorized agent during regular business hours, and Coverall shall have the right to examine same, including other related records. Upon Coverall's request, Franchisee shall prepare and/or produce to Coverall such records and books, and any other information, including without limitation financial statements and personal and business income tax returns, that will permit Coverall to verify that all fees due Coverall are fully, accurately, and truthfully accounted for, and that Franchisee is not otherwise in breach of this Agreement. Franchisee shall be responsible to reimburse Coverall for the cost of the audit if the audit reveals a violation of Paragraph 18A of this Agreement. Coverall's right to reimbursement shall be in addition to any other rights or remedies it has under this Agreement or otherwise.

K.  Computer Equipment.  Franchisee must have access to a personal computer or other device with Internet access and full-web browsing capabilities, the ability to send and receive electronic mail, and must provide Coverall with an email address.

L.  Website.  Franchisee may establish a website only upon obtaining Coverall's prior written consent. Franchisee shall adopt the format specified by Coverall from time to time for Janitorial Franchise websites; and shall not upload its website to the web until approved by Coverall's Marketing Department. Franchisee agrees, upon Coverall's request, to link its website to the official Coverall website, and/or remove its current website and adopt the format then mandated by Coverall's Marketing Department.

M.  Franchisee Service to Customers.  All services provided to the customers of the Franchised Business shall be performed in a good and workmanlike manner, satisfactory to the customers, and in accordance with Coverall standards. High quality services are essential to the reputation and goodwill associated with the Coverall System and Marks.

N.  Voluntary Abandonment of Customer by Franchisee.  If Franchisee desires to cease servicing a customer, Franchisee shall give Coverall ten (10) days' written notice before ceasing service. In such event, any remaining guarantee for the Regular Service Volume shall be deemed to have been fulfilled, and Coverall shall have no obligation to replace the Regular Service Volume. If the customer cancels its Service Agreement, Franchisee shall remain liable to pay any outstanding balance due on any financing related to the customer(s) abandoned by Franchisee. If, however, Coverall successfully transitions the abandoned customer to another Franchisee and but for Franchisee's abandonment, Franchisee would otherwise qualify for a guarantee, Coverall may, in its sole discretion, replace the Regular Service Volume lost due to Franchisee's abandonment of the customer applying the applicable Business Multiplier. In such instance, the replacement Regular Service Volume is not guaranteed.

18.  RESTRICTIONS.

Franchisee agrees and covenants as follows:

A.  In-Term Restrictions.  During the Term of this Agreement and any Renewal Term, Franchisee shall not, without the prior written consent of Coverall, directly or indirectly, engage in, or acquire any financial interest in (either as an individual, principal, owner, agent, employee, partner, stockholder, or director) any business which performs commercial janitorial and related commercial cleaning and maintenance services, or engages in the franchising of commercial cleaning businesses, or any related business anywhere in the Area. Franchisee shall not divert any customer of its Franchised Business to another entity, whether or not that entity is directly or indirectly controlled by Franchisee unless Franchisee obtains Coverall's written consent.

B.  Post-Term Restrictions.  In the event this Agreement is assigned, terminated, or expires, for any reason whatsoever, Franchisee shall not solicit, directly or indirectly, without the prior written consent of Coverall: (i) any customer repurchased by Coverall or by another Coverall franchisee for a period of eighteen (18) months from the date of repurchase; and (ii) for a period of eighteen (18) months from the date of

assignment, termination or expiration of this Agreement: (a) any current employee of Coverall or (b) any franchisee of Coverall.

Should a customer serviced by Franchisee prior to termination initiate contact with Franchisee for the purpose of engaging Franchisee to provide cleaning or related services to customer, unless Coverall has otherwise agreed in writing, Franchisee shall decline to provide such services until such time as the term of this non-solicitation covenant has expired.

C. Use of Coverall System. Franchisee shall not appropriate, use or duplicate the Coverall System, or any portion thereof, for use in any other commercial or residential cleaning, maintenance or related business.

D. Confidentiality. Franchisee shall not disclose or reveal any portion of the Coverall System to a non-franchisee other than to Franchisee's employees who have a need to know in order to carry out the functions of their employment.

E. License and Goodwill Restrictions. Franchisee shall acquire no right to use, or to license the use of, any name, Mark, or other intellectual property right granted or to be granted herein, except in connection with the operation of the Franchised Business. Franchisee has no right, title or interest in or to Coverall's goodwill. Goodwill inures solely to the benefit of Coverall.

19. FRANCHISEE IS AN INDEPENDENT CONTRACTOR.

Franchisee is and shall remain at all times a completely independent contractor in business for itself operating a commercial cleaning Franchised Business, and shall have no right or interest in or authority over Coverall, the Coverall System, or any of Coverall's goodwill, property or business. Franchisee hereby acknowledges that it has no authority to sign on behalf of Coverall any written agreement.

A. Neither Franchisee, nor Franchisee's employees, are employees of Coverall. Neither Coverall nor Franchisee is the principal, agent, employer, employee, partner, officer, director, or owner of the other. Franchisee shall always hold itself out as an independent contractor in its dealings and communications with the public.

B. Franchisee acknowledges and agrees that it is not an employee of Coverall; that Franchisee intended to buy a Franchised business; and that Franchisee does not intend to become an employee of Coverall. Franchisee is the owner of a Franchised Business, a business owner in all respects, and is not entitled to participate in any benefits provided by Coverall to those whom Coverall classifies as its employees; and Franchisee is not covered by either Coverall's workers' compensation insurance or unemployment compensation. Franchisee must purchase this insurance on its own for the benefit of employees of its Franchised Business. Should any state or federal agency or court determine that Franchisee falls within the definition of an employee of Coverall under any state or federal statute, Coverall does not intend to provide Franchisee retroactively or thereafter with any benefits (including but not limited to, vacation pay, overtime, rest and meal breaks, healthcare benefits, worker's compensation, or unemployment compensation) that it may provide to those whom Coverall classifies as employees, unless obligated by law to do so. Coverall may, in its sole discretion, terminate or modify this Agreement upon any such determination by a state or federal agency or court that Franchisee is an employee of Coverall.

20. INDEMNIFICATION.

Franchisee shall be solely responsible for its business operations, including but not limited to, the services and results of services performed by Franchisee and its employees for Franchisee's customers, and shall indemnify and hold harmless Coverall and its affiliates, and directors, officers and employees of each, and all other Coverall franchisees from all expenses, fines, suits, proceedings, claims, losses, damages, liabilities or actions of any kind or nature (including, but not limited to, costs and attorneys' fees) arising out of or in any way connected with Franchisee's business operations. Franchisee further agrees that if Coverall is made a party to a lawsuit or other legal action in connection with the activities of Franchisee, then Coverall may tender the defense and/or prosecution of the case to Franchisee who shall be responsible for diligently pursuing the case or action at Franchisee's expense, or Coverall may hire counsel directly to protect its interests and bill Franchisee for all costs and attorneys' fees incurred, and Franchisee shall promptly reimburse Coverall costs and expenses incurred. The obligations of Franchisee pursuant to this

Paragraph shall survive the expiration or termination of this Agreement. If Franchisee participates in in Coverall's Business Protection Plan, Coverall will waive certain of its contractual indemnification rights against Franchisee except for the applicable deductibles under the Coverall Business Protection Plan.

21. ASSIGNMENT.

A.  Coverall's Right to Assign the Franchise Agreement.  Coverall may, without the consent of Franchisee, assign this Agreement, or Coverall's rights and duties under this Agreement, to any other entity or third party, whether affiliated with or independent of Coverall. Coverall may also assign to any other entity or third party, whether affiliated with or independent of Coverall, any promissory note or other negotiable instrument of Franchisee which is payable to Coverall, either in conjunction with or independent of this Agreement. Coverall's rights under this Agreement shall inure to the benefit of any assignee or legal successor to Coverall.

B.  Franchisee's Right to Assign the Franchise Agreement.  Except as stated below, neither Franchisee nor any shareholder or member of Franchisee may transfer or assign any interest in the Agreement, the Franchised Business or shares or membership interests in Franchisee.  Franchisee may, with the written consent of Coverall obtained after thirty (30) days written notice to Coverall, which consent will not be unreasonably withheld, transfer or assign all or part of its interest in this Agreement, the Franchised Business, or shares or membership interests in Franchisee provided that:

(i)     Franchisee provides Coverall a copy of any written agreements relating to the proposed Assignment, and any additional information which Coverall may require in order to determine whether it will grant its consent to the proposed assignment, including but not limited to, background investigations of the assignee(s);

(ii)    If an Assignment of 100% of Franchisee's interest in the Franchised Business or this Agreement, the assignee enters into the Janitorial Franchise Agreement then used by Coverall for granting new franchises;

(iii)   Franchisee shall pay Coverall the then current Transfer Fee as published in the Policies and Procedures Manual;

(vi)    Franchisee pays to Coverall all amounts due by Franchisee to Coverall or Franchisee's assignee, subject to Coverall's consent, assumes all such obligations owed to Coverall;

(v)     Franchisee executes confidentiality and non-solicitation agreements in assignee's favor and in Coverall's favor with terms and conditions the same as the confidentiality and non-solicitation covenants in this Agreement;

(vi)    The assignee shall have the ability to immediately be in compliance with all laws, regulations and ordinances governing the operation of a commercial janitorial cleaning business;

(vii)   Franchisee executes a general release, in a form satisfactory to Coverall, of any and all claims against Coverall and its affiliates and their officers, directors, employees, and agents; and

(viii)  Any person to whom the shares or membership interests are transferred or assigned agree to be bound by the guaranty provisions of this Agreement and execute Coverall's then standard Guaranty Agreement to personally guaranty the obligations of Franchisee to Coverall and execute Coverall's then standard Confidentiality Agreement.

If, at the time of an assignment by Franchisee, there is Initial Business or Additional Business to which Franchisee ("the assignor") is entitled, which Coverall has not yet provided, this Initial or Additional Business shall be provided by Coverall to the assignee within a reasonable period of time after the assignee successfully completes the initial Training program.

If at the time of an assignment of this Agreement, Franchisee is servicing customers and those customers will be transferred to assignee, the assignee shall, within forty-five (45) days from the date of the assignment, complete to Coverall's satisfaction Initial Training.  Until assignee completes the Initial Training to Coverall's satisfaction, the assignor shall remain responsible for assignor's customers, including but not limited to, supervising the assignee and/or assignee's employees servicing of the customers. If the assignee does not complete training to Coverall's satisfaction within forty-five (45) days, or assignor does not provide the required supervision, Coverall may at the end of this forty-five (45) day period terminate the assignee and Coverall will have no obligation to replace the Regular Service Volume that assignee

received from assignor. However, assignee's Franchise Agreement may be terminated prior to the expiration of forty-five (45) days if the assignee is in default under the terms of the Franchise Agreement.

Coverall may, in Coverall's sole discretion, withhold written consent of any proposed assignment in the event that Franchisee is in default under the terms of this or any other agreement with Coverall until default is cured.

C.   <u>Franchisee's Right to Transfer Customers or Business Owed</u>. Franchisee must obtain Coverall's written consent before transferring any customer or Business Owed to another franchisee, which consent will not be unreasonably withheld. Transfer Fees equal to ten percent (10%) of the Regular Service Volume attributable to each transferred customer, not to exceed $500 each, and ten percent (10%) of the Business Owed transferred will be assessed.

22.   <u>DEFAULT AND TERMINATION.</u>

A.       Coverall may terminate this Agreement, effective upon delivery of written notice of termination to Franchisee, if:

(i).       Franchisee (or any of its owners) has made or makes any material misrepresentation or omission in its franchise application or in acquiring the Franchised Business;

(ii).      Franchisee becomes insolvent, admits in writing the inability to pay Franchisee's monetary obligations as they mature, is adjudicated a bankrupt, voluntarily files a petition for liquidation or reorganization under any provision of the United States Bankruptcy Code, makes an assignment for the benefit of creditors or takes any other action pursuant to any federal or state insolvency statute;

(iii)      Franchisee makes an unauthorized assignment of this Agreement, the Franchised Business, or an ownership interest in Franchisee;

(iv).     In connection with the operation of the Franchised Business, Franchisee (or any of its owners) engages in any dishonest, immoral, unethical or illegal conduct which might adversely affect the reputation of the Franchised Business or Coverall or the goodwill associated with the Marks;

(v).      In the event of Franchisee's or its principal owner's death or disability, this Agreement or the principal owner's interest in the Franchise is not assigned in accordance with the provisions of Paragraph 21 of this Agreement; or

(vi).     Franchisee fails, on three (3) or more separate occasions within any twelve (12) month period, to comply with the terms of this Agreement, any other agreement between Franchisee and Coverall, or any Service Agreement, whether or not it corrects the failure after receipt of written notice.

B.       Coverall may terminate this Agreement, effective upon delivery of written notice of termination to Franchisee, if Franchisee fails to cure the following defaults within ten (10) days after delivery written notice of the default:

(i)       Franchisee breaches this Agreement, any other agreement between Franchisee and Coverall, or any Service Agreement; or

(ii)      Franchisee abandons the Franchised Business by failing to actively operate the Franchised Business for a period of ninety (90) consecutive days.

23.   <u>PROCEDURES AFTER EXPIRATION, TERMINATION OR ASSIGNMENT.</u>

Upon expiration, termination for any reason, or assignment of this Agreement, Franchisee shall cease to be a Coverall Franchisee and shall do all of the following acts and things, each of which shall survive the termination of this Agreement:

A.   Immediately pay to Coverall all monies due to the date of expiration, termination, or assignment, and cease doing business as a Coverall franchisee. Any amounts due Coverall at or after Franchisee's termination may be offset against any amounts collected by Coverall on Franchisee's behalf.

B.   Immediately and permanently discontinue the use of the Coverall System and all Coverall Marks, or any other name or designation indicating or tending to indicate that Franchisee is or ever was an authorized Coverall franchisee. Furthermore, Franchisee shall not promote or advertise the fact that Franchisee was formerly a franchisee or affiliate of Coverall.

C. Except in the case of an assignment of this Agreement, promptly surrender to Coverall all documents, including but not limited to, the Coverall Manuals, marketing material, letterhead, business forms, bearing the Coverall Marks, or any designation indicating or tending to indicate that Franchisee is or was an authorized Coverall franchisee.

D. Immediately and permanently discontinue all advertising for the Franchised Business.

E. Maintain all books, records, and reports required by Coverall pursuant to Paragraph 17J for a period of not less than three (3) years after the termination, and allow Coverall to perform a final audit of Franchisee's books and records during normal business hours within the three (3) year period.

F. Immediately and permanently discontinue wearing any apparel indicating or tending to indicate that the Franchise is or was an authorized Coverall Franchise, and promptly surrender to Coverall all apparel bearing a Coverall Mark.

G. All obligations of the parties which survive the expiration or termination of this Agreement shall continue in full force and effect.

H. If Coverall terminates this Agreement, Franchisee may with Coverall's consent, which consent shall not be unreasonably withheld, sell its customers and/or Business Owed to another Coverall franchisee; or Coverall may purchase some or all of Franchisee's customers and/or Business Owed. Customers and Business Owed that Franchisee has not paid for in full are not eligible for either sale to another Franchisee or purchase by Coverall; such customers shall revert to Coverall. The amount due to Franchisee upon Coverall's purchase of Franchisee's customers and/or Business Owed will first be applied to satisfy any monetary obligations owed by Franchisee to Coverall; and the balance, if any, may, in Coverall's sole discretion, be paid to Franchisee in two (2) or more installments. As a condition precedent to Franchisee's receipt of payment from Coverall, Franchisee shall assist with the transition of any customers to another franchisee; and Franchisee may be required to execute an asset purchase agreement, which shall contain, among other provisions, a general release in favor of Coverall. Coverall will pay Franchisee an amount equal to the Multiplier applicable to such purchases as provided in the Policies and Procedures Manual times the Regular Service Volume purchased. Upon termination, Franchisee forfeits all rights to its customers; and any customers not sold by Franchisee shall revert to Coverall.

I. Upon expiration of the Term of this Agreement:

    (i)    Coverall shall have an option to purchase some or all of Franchisee's customers and Business Owed, if any, excluding any promotional (free) Business Owed, which option shall be exercisable in Coverall's sole discretion. Customers and Business Owed that Franchisee has not paid for in full are not eligible for purchase by Coverall; such customers shall revert to Coverall. The option price shall be the Multiple applicable to such purchases as provided in the Policies and Procedures Manual times the Regular Service Volume attributable to those customers. The amount due upon Coverall's purchase of Franchisee's customers will first be applied to satisfy any monetary obligations owed by Franchisee to Coverall; and the balance, if any, may, in Coverall's sole discretion, be paid to Franchisee in two (2) or more installments. As a condition precedent to Franchisee's receipt of payment from Coverall, Franchisee shall assist with the transition of any customers to another franchisee; and Franchisee may be required to execute an asset purchase agreement, which shall contain, among other provisions, a general release in favor of Coverall.

    (ii)    If Coverall declines to exercise its option and Franchisee is in good standing, not in default under any provision of this Agreement, and has fully paid its obligations to Coverall:

        a)  Franchisee may, with the exception of National Account Customers or customers having contracts that prohibit assignment, retain its then-existing fully paid customers, and Coverall will waive those provisions of Paragraph 18B that might be construed to prevent Franchisee from servicing those customers. All other provisions of Paragraph 18B shall remain in full force and effect.

        b)  Coverall may purchase Franchisee's fully paid Business Owed, if any, excluding any promotional (free) Business Owed, at the Multiple applicable to such purchases as provided in the Policies and Procedures Manual times the Business Owed as reflected on Coverall's books and records.

    c) The purchase price will first be applied to satisfy any monetary obligations owed by Franchisee to Coverall; and the balance, if any, will be paid to Franchisee.

    d) Customers for which Franchisee has not paid in full will revert to Coverall; and any unpaid Business Owed is not eligible for purchase by Coverall.

    e) Franchisee shall execute a general release in favor of Coverall.

24. INFORMAL DISPUTE RESOLUTION/MEDIATION.

If a dispute arises between Coverall and Franchisee and if the dispute is not resolved or settled, Coverall and Franchisee agree that prior to filing any proceeding, whether in arbitration or (if permissible) in court, they will attempt, in good faith, to settle the dispute by non-binding mediation administered pursuant to the Commercial Mediation Rules of the American Arbitration Association, or as otherwise agreed upon in writing by the parties. The mediation shall take place in the Area in which Franchisee conducts its business, and shall be administered by a neutral mediator agreed upon by the parties. In the event Coverall and Franchisee are unable to agree upon a mediator within 15 days of the date on which either party requests mediation of a matter, the mediator shall be designated by the American Arbitration Association. The costs of the mediation shall be shared equally by the parties unless otherwise agreed in writing.

25. DISPUTE RESOLUTION/ARBITRATION.

A. Arbitration. Except as otherwise provided in this Agreement, all controversies, disputes or claims between Coverall, its officers, directors, agents and/or employees (in their respective capacities) and Franchisee (and Franchisee's owners, officers, directors, agents and/or employees and/or any guarantors of this Agreement) arising out of or related to this Agreement or the validity of this Agreement or any provision thereof (including this arbitration agreement, the validity and scope of which Coverall and Franchisee acknowledge and agree is to be determined by an arbitrator, not a court), any related agreement between the parties or the validity thereof, the relationship of the parties hereunder or under any related agreement between the parties, and/or any specification, standard or operating procedure of Coverall, including those set forth in the Policies and Procedures Manual, which controversies, disputes or claims are not resolved in accordance with Paragraph 25, shall be submitted promptly for binding arbitration. The arbitration shall take place in the Area in which Franchisee conducts its business. Arbitration shall be subject to the Federal Arbitration Act and not any state arbitration law and, except as otherwise provided in this Agreement or agreed upon by the parties in writing, the then current Rules of the American Arbitration Association for Commercial Arbitration.

B. Franchisee and Coverall agree that arbitration shall be conducted on an individual, not a class wide basis, that only Coverall (and its officers, directors, agents and/or employees) and Franchisee (and Franchisee's owners, officers, directors and/or guarantors) may be parties to any arbitration proceeding described in this Paragraph 25B, and that no such arbitration between Coverall and Franchisee shall be consolidated with any other proceeding between Coverall and any other Franchisee or third party. Notwithstanding the foregoing or anything to the contrary in this Agreement, if any court or arbitrator determines that all or any part of this Paragraph 25B is unenforceable with respect to a dispute that otherwise would be subject to arbitration under this Paragraph, then Coverall and Franchisee agree that this arbitration clause shall not apply to that dispute and that such dispute shall be resolved in a judicial proceeding.

C. The parties agree that in connection with any arbitration proceeding, each party must submit or file any compulsory counterclaim (as defined by the Federal Rules of Civil Procedure) within thirty (30) days of the date of the submission or filing of the claim to which it relates or such counterclaim shall be forever barred. The parties also agree to be bound by, and the arbitrator shall be bound to apply, the provisions of any applicable limitation on the period of time in which claims must be brought, including any set forth in this Agreement. Further, the parties agree that discovery may be conducted in accordance with the provisions of the Federal Rules of Civil Procedure; provided, however, that neither party shall be required to make the initial disclosures required under Rule 26(a)(1) of the Federal Rules of Civil Procedure.

D. The decision of the arbitrator shall be conclusive and binding upon all parties, and judgment upon the award may be entered in any court of competent jurisdiction. The arbitrator shall not have the authority to declare any mark generic or otherwise invalid. Franchisee and Coverall waive to the fullest extent permitted by law any right or claim for any punitive or exemplary damages. Coverall reserves the right, but has no

Exhibit A.1 to
Janitorial Franchise Disclosure Document
Page 15 of 19

Initial  Initial

obligation, to advance Franchisee's share of the cost of any arbitration proceeding and by doing so shall not be deemed to have waived or relinquished Coverall's right to seek the recovery of those costs.

E. <u>Injunction and Specific Performance</u>. Notwithstanding anything in Paragraphs 24 and 25 to the contrary, Coverall and Franchisee shall be entitled to apply at any time directly to a court of competent jurisdiction for the entry of preliminary and permanent injunctions and orders of specific performance. The prevailing party shall be entitled to collect from the non-prevailing party an amount equal to the costs incurred by the prevailing party in obtaining relief, including, without limitation, attorney's fees, litigation costs and expenses, as well as any damages incurred.

F. <u>Attorneys' Fees</u>. Should either party incur attorney's fees in order to enforce the terms and conditions of this Agreement, including post-term covenants, the prevailing party shall be entitled to reimbursement by the other party of all litigation costs, including attorneys' fees.

G. <u>Survival</u>. The parties agree that the provisions of this Paragraph 25 are intended to benefit and bind certain third party non-signatories and shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

H. <u>WAIVER OF JURY TRIAL</u>. TO THE EXTENT PERMITTED BY APPLICABLE LAW COVERALL AND FRANCHISEE (AND FRANCHISEE'S OWNERS, OFFICERS, DIRECTORS AND/OR ANY GUARANTORS OF THIS AGREEMENT) IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER OF THEM.

26. <u>TIME TO ASSERT CLAIMS.</u>

Any and all claims and actions arising out of or relating to this Agreement, the relationship of Franchisee and Coverall, or Franchisee's operation of its business, brought by any Party hereto against the other, shall be commenced within two (2) years from the occurrence of the facts giving rise to such claim or action, or such claim or action shall be barred. This limitations period shall be enforceable to the fullest extent permitted by law.

27. <u>GOVERNING LAW.</u>

This Agreement shall be interpreted and governed by the laws of the state in which the Franchise granted herein is located.

28. <u>ENTIRE AGREEMENT.</u>

This is the full agreement of the parties. Any matter which is not actually written down and included in this document is not a term of this Agreement. To avoid any later misunderstanding about the exact terms of the Agreement, each party affirms, by signing this Agreement, that it has not relied on any comment, promise, or representation not actually included in this Agreement. By signing this Agreement, the parties mutually agree that no evidence shall be admitted in any proceeding as to the existence of any term or promise claimed to be a part of the Agreement unless that term is explicitly stated within the Agreement.

*DO NOT SIGN THIS AGREEMENT IF FRANCHISEE IS RELYING UPON ANY REPRESENTATION OR PROMISE NOT STATED IN THIS AGREEMENT. NOTHING IN THE AGREEMENT IS INTENDED TO DISCLAIM THE REPRESENTATIONS COVERALL MADE IN THE FRANCHISE DISCLOSURE DOCUMENT THAT COVERALL FURNISHED TO FRANCHISEE.*

29. <u>AMENDMENT.</u>

This Agreement may not be modified, altered, or amended except in writing executed by all of the Parties.

30. <u>WAIVERS.</u>

Waiver by Coverall of any one or more defaults shall not operate as a waiver of successive or other defaults and all of Coverall's rights shall continue notwithstanding any such waiver or waivers.

©2016 Coverall North America, Inc.

Initial   Initial

31. FORCE MAJEURE.

No party shall be liable for any loss or damage due to any delay in the performance of the terms (except for the payment of money) by reason of strikes, lockouts, and other labor troubles, fires, riots, wars, acts of terrorism, embargoes and civil commotion, or acts of God. Any such delay shall extend performance only so long as such event is in progress.

32. SEVERABILITY.

If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

33. NOTICES.

Any notices to be given by either Party to the other may be effected in writing either by personal delivery or by first class mail, postage prepaid. Mailed notices should be addressed to Franchisee and to Coverall at the addresses set forth on Page 1 of this Agreement. Either Party may designate a different address for notice in writing delivered to the other party. Notices personally delivered shall be deemed received when delivered. Notices sent by mail shall be deemed received on the second day following mailing.

34. SUCCESSORS BOUND.

This Agreement shall bind, and shall inure to the benefit of, the executor, administrator, personal representative, heirs, successors and assigns of each of the Parties.

35. SURVIVAL OF PROVISIONS.

Any provision or covenant of this Agreement which expressly or by its nature imposes obligations beyond the expiration or termination of this Agreement shall survive expiration or termination.

36. CAPTIONS.

The captions used in this Agreement are inserted as a matter of convenience. The text of any paragraph of this Agreement shall control its interpretation.

37. GUARANTY.

The shareholders or members of any corporate entity constituting Franchisee, and shareholders or members of any corporate entity that may own the shares of the partnership or corporate entity which is Franchisee, (the shareholders or members are listed in on page 1), do by signing this Agreement, (i) guaranty the performance of all Franchisee's responsibilities and duties; (ii) guaranty the payment of all sums which may from time to time become due to Coverall under this Agreement; and (iii) agree to be bound by Paragraphs 18, 20, 23, 24 and 25. The shareholders or members shall also, at the time of the execution of this Agreement, execute the current form Guaranty to the Coverall Janitorial Franchise Agreement. The shareholders or members also agree to execute all Promissory Notes executed by Franchisee.

This provision shall be equally binding upon the current shareholders or members of the corporate entity which is Franchisee, and upon any additional shareholders or members who may subsequently obtain an ownership interest in Franchisee, pursuant to Paragraph 21 of this Agreement. Franchisee specifically agrees that within thirty (30) days prior to any additional shareholders or members obtaining an ownership interest in Franchisee that Franchisee shall notify Coverall in writing of this fact, and such additional shareholders or members shall be approved by Coverall, who approval shall not be unreasonably refused. At that time, Coverall will give Franchisee its then current Franchisee confidentiality and guaranty form. These forms are to be executed by the additional shareholders or members concurrently with their obtaining their ownership interest in Franchisee.

©2016 Coverall North America, Inc.

Initial   Initial

38. CERTIFICATION.

The Franchisee certifies that they are not, nor to their best knowledge been designated, a terrorist and/or a suspected terrorist, nor are associated and/or affiliated in any way with any terrorist and/or suspected terrorist person and/or organization, as defined in U.S. Executive Order 13224 and/or otherwise.

If Franchisee is a company, the person signing on behalf of Franchisee certifies that, to Franchisee's best knowledge, neither Franchisee, such person, and/or any owners, officers, board members, similar individuals and/or affiliates/associates of Franchisee are, or have been designated, a terrorist and/or a suspected terrorist, nor is Franchisee or any such persons and/or affiliates/associates owned, controlled, associated and/or affiliated in any way with any terrorist and/or a suspected terrorist person and/or organization, as defined in U.S. Executive Order 13224 and/or otherwise.

Franchisee agrees to fully comply and/or assist Coverall in its compliance efforts with any and all laws, regulations, Executive Orders or otherwise relating to anti-terrorist activities, including without limitation the U.S.A. Patriot Act, Executive Order 13224, and related U.S. Treasury and/or regulations, including properly performing any currency reporting and other obligations, whether relating to Franchisee in each case as designated by Coverall and/or as required by applicable law.

**SIGNATURES APPEAR ON THE FOLLOWING PAGE.**

Initial   Initial

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the day and year written above.

THIS AGREEMENT SHALL NOT BE VALID UNLESS SIGNED BY (i) FRANCHISEE; (ii) AN AUTHORIZED REPRESENTATIVE OF COVERALL'S REGIONAL SUPPORT CENTER; AND (iii) AN OFFICER OF COVERALL.

FRANCHISEE: _Janitorial Tech LLC_
(Print name of corporation or limited liability company.)

By: _Randall Richardson_   _____  5/17/16_
                                                                      Date Signed

By: _____
                                                                      Date Signed

By: _____
                                                                      Date Signed

COVERALL NORTH AMERICA, INC. d/b/a ATLANTA            Support Center

By: _____   _5-17-16_
                                                                      Date Signed

Title: _General Manager_

ACCEPTED ON THIS _1st_ DAY OF _June_ , _2016_ .

COVERALL NORTH AMERICA, INC.

By: _____ , Vice President